**Charles GORDON, Appellant,**

v.

**Robert J. NEVIASER, M.D., Appellee.**

**No. 83–93.**

District of Columbia Court of Appeals.

Submitted March 23, 1984.

Decided June 29, 1984.

David S. Greene and Irwin G. Meiselman, Rockville, Md., were on the brief for appellant.

Steven A. Hamilton, Rockville, Md., was on the brief for appellee.

Before BELSON, TERRY and ROGERS, Associate Judges.

TERRY, Associate Judge:

Appellant brought a medical malpractice action against appellee, claiming that appellee had not adequately informed him of the risks involved in certain surgery performed on his shoulder. The trial court granted appellee's motion for a directed verdict at the close of appellant's case. We hold that the trial court erred, but that the error was harmless because the court would have had to grant the motion for a different reason. Accordingly, we affirm the judgment in favor of appellee.

I

In November 1976 appellant injured his left shoulder while skiing. An arthrogram of the shoulder revealed a tear in the left rotator cuff, which caused appellant to experience pain when he moved his left arm to a certain position. His treating physician suggested surgery to correct the problem. In September 1977 appellant sought a second opinion and consulted with appellee, a specialist in shoulder injuries. Appellee also recommended surgery.

In October appellee operated on appellant's left shoulder. The operation was not successful, however, because appellant emerged from it with reduced mobility in the shoulder and more widespread and persistent pain. In January 1978 another arthrogram was taken of appellant's shoulder, and appellee performed a second operation. Again, the operation was a failure, and the condition of appellant's shoulder remained unchanged. Appellee suggested a third operation, which appellant declined.

At trial appellant testified that appellee had told him there was a ninety percent chance that the first operation would be successful and a ten percent chance that there would be no improvement, but that appellee had not even mentioned the possibility that after the surgery he might be worse off than before.[1] Appellant stated that if he had been informed that his chances of success were in the seventy to eighty percent range and that there was a possibility that his condition might deteriorate as a result of the surgery, he would

---

1. Appellee's counsel sought to impeach appellant with his deposition testimony in which he stated that the percentage of success allegedly quoted to him by appellee pertained to appellee's overall rate of success in performing this type of operation, not to appellant's particular chances. Appellant stated at trial, however, that his "impression" was that such a high rate of success applied to his case as well.

not have gone through with the operation. Finally, appellant acknowledged that he had signed a form consenting to the operation which indicated that the possible risks of the surgery had been explained to him "with the background information provided" by appellee.

## II

In *Crain v. Allison*, 443 A.2d 558 (D.C.1982), this court adopted the decision and rationale of the United States Court of Appeals in *Canterbury v. Spence*, 150 U.S. App.D.C. 263, 464 F.2d 772, *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), regarding the duty of a physician to inform a patient of the choices with respect to a proposed course of treatment and its attendant dangers. In a nutshell, material information regarding the proposed treatment must be communicated to the patient. The test for assessing the materiality of any given information is whether "[a] reasonable person in what the physician knows or should know to be the patient's position would be likely to attach significance to the risks in deciding to accept or forego the proposed treatment." *Crain v. Allison, supra,* 443 A.2d at 562 (citations omitted). "Whenever nondisclosure of particular risk information is open to debate by reasonable-minded men, the issue is for the finder of the facts." *Canterbury v. Spence, supra,* 150 U.S.App.D.C. at 279, 464 F.2d at 788 (footnote omitted). Once there has been a breach of the duty to disclose, the patient must demonstrate a causal relation between the physician's failure to disclose the material information and the injury sustained. *Id.* at 281, 464 F.2d at 790. "A causal connection exists when, but only when, disclosure of significant risks incidental to treatment would have resulted in a decision against it." *Id.* (footnote omitted); *accord, Flannery v. President and Directors of Georgetown College,* 220 U.S.App.D.C. 142, 144, 679 F.2d 960, 962 (1982). The causality determination must be resolved under an objective, not a subjective standard. That is, the question is not what this particular patient

would have done if there had been adequate disclosure, but what a reasonably prudent person in the patient's position would have done if adequately informed. *Canterbury v. Spence, supra,* 150 U.S. App.D.C. at 282, 464 F.2d at 791; *accord, Hitchcock v. United States,* 214 U.S.App. D.C. 198, 206, 665 F.2d 354, 362 (1981).

In ruling on a motion for a directed verdict, the trial court must consider the evidence in the light most favorable to the non-moving party. *E.g., Gabrou v. May Department Stores Co.,* 462 A.2d 1102, 1104 (D.C.1983); *Papanicolas v. Group Hospitalization, Inc.,* 434 A.2d 403, 404 (D.C.1981). When the evidence is viewed in this manner, a directed verdict is justified " '... only when the evidence is so clear that reasonable men could reach but one conclusion.' ... If there is room for a difference of opinion, the wise course is for the trial judge to allow the case to go to the jury." *Corley v. BP Oil Corp.,* 402 A.2d 1258, 1263 (D.C.1979) (citations omitted); *see Gordon v. Raven Systems & Research, Inc.,* 462 A.2d 10, 12 (D.C.1983). After reviewing the record, we conclude that the evidence was insufficient to allow the case to go to the jury, but not for the reasons stated by the trial court.

In directing a verdict for appellee, the trial court gave conclusive weight to the consent form, executed by appellant prior to the operation, which stated that "the possible risks and consequences associated with this type of operation ... and the other risks that are attendant to the performance of any surgical procedure" had been explained to him. Specifically, the court said:

[B]earing in mind the plaintiff here is a very highly intelligent gentleman, that he is not the ordinary run of a person who doesn't read or write very well. He says that he did read it, as I recall it, and if he didn't he should have. Having read it—or not having read it but having signed it, he was bound by its terms.

Under that form the plaintiff is clearly giving his consent to the operation. He has been informed, according to the language of the consent form. He has been informed of the possible consequences of this operation.

Now counsel has stated that he wasn't told all of the possible consequences. Well, I don't think that under any circumstance is a physician capable or required to ... inform a patient of all the possible consequences of an operation. There is always a gamble involved in the most minor operation.

After citing the language in the consent form quoted above, the court concluded:

That really covers the waterfront. I have no hesitancy here in saying no reasonable juror would construe that other than the manner in which I have construed it, namely, there was informed consent. There was an explanation of the risks. Either that or the plaintiff did not request them or whatever. It must be assumed that based on the evidence that he was fully advised of the risks of this operation.

No reasonable juror could conclude otherwise. Plain black-and-white English language. We find that there isn't sufficient evidence here for the jury to consider the allegation that the defendant did not exercise that standard of care required of him as a surgeon under all of the facts and circumstances in this case.

The plaintiff was fully informed. He gave his informed consent as evidenced by the record and the undisputed evidence in this case, to this procedure.

■ The trial court reasoned, in effect, that appellant's claim was barred by the fact that he knowingly signed the consent form and was bound by its contents. In light of appellant's testimony, this was error. Appellant testified that, given the rate of success allegedly quoted to him by appellee, the only risk he associated with the surgery was that his condition might not improve. After the presentation of appellee's case, the jury would have had to determine whether appellee's explanation of "the possible risks and consequences," to which the consent form referred, included the risk that his condition might actually deteriorate as a result of the surgery; if not, whether this particular risk should have been disclosed to appellant; and, if so, whether appellee in fact failed to do so. Appellant's testimony placed all of these issues before the jury. *See generally* 61 AM.JUR.2D *Physicians, Surgeons, and Other Healers* § 182 (1981).

### III

But even if the jury had found that appellee breached his duty to disclose this risk to appellant, it would also have had to find a causal connection between the undisclosed risk and the subsequent injury. Specifically, the jury would have had to determine whether a reasonably prudent person in appellant's position would have declined to go through with the operation if he had been told that there was a possibility that his shoulder condition might deteriorate as a result of the surgery. *Canterbury v. Spence, supra,* 150 U.S.App.D.C. at 281, 464 F.2d at 790. Appellee argues that appellant presented no evidence establishing whether the injury, *i.e.,* the deterioration in the condition of his shoulder, "was a result of [appellee's] surgery or whether it was a continuing injury associated with ... the original ski accident ...." We find merit in this contention.

"Ordinarily, in a medical malpractice case, expert testimony is required in order to prove the proper standard of care and causation." *Sponaugle v. Pre-Term, Inc.,* 411 A.2d 366, 368 (D.C.1980) (citations omitted). In non-disclosure cases, expert testimony is usually required on the issue of "the risks of therapy and the consequences of leaving existing maladies untreated. [Experts] are normally needed on issues as to the cause of any injury or disability suffered by the patient .... Save for relative[ly] infrequent instances where questions of this type are resolved wholly within the realm of ordinary human knowledge

and experience," expert testimony is essential. *Canterbury v. Spence, supra,* 150 U.S.App.D.C. at 282–283, 464 F.2d at 791–792 (footnote omitted).[2]

In the instant case, the deposition of appellant's expert witness, Dr. Alan B. Lippitt, was introduced into evidence at trial. Dr. Lippitt testified that if the surgery to correct the torn rotator cuff were not successful, there was a chance that appellant's condition would "be made worse because healthy tissue must be cut," leaving less tissue available to perform the normal functions of the shoulder. But Dr. Lippitt's testimony did not quantify the degree of risk involved. He stated that according to the medical literature and his own experience, the chances of success were in the seventy percent range, although this percentage would be greater for a physician who specialized in this type of surgery. However, he could not say "with any. reasonable medical certainty how much pain [was] secondary to the surgery as opposed to the original problem" because "the preoperative documentation of the shoulder condition was sketchy."

The testimony of an expert was necessary to establish both that there was a risk involved in the surgery and that the condition of appellant's shoulder deteriorated as a result of the surgery. Dr. Lippitt's testimony was effective to prove the former, but not the latter. Thus appellant's evidence was insufficient to enable the jury to determine whether it was more probable than not that the conduct of the defendant brought about the injury, or, to put it another way, that the undisclosed risk "materialized." *Canterbury v. Spence, supra,* 150 U.S.App.D.C. at 281, 464 F.2d at 790.

In short, the court properly granted appellee's motion for a directed verdict, but for the wrong reason. Appellant testified that had he been informed of the risk that the condition of his shoulder might deteriorate as a result of the surgery, he would not have gone through with it. He explained that when he signed the consent form, the risk which he associated with the surgery was that his condition would not improve, not that it would get worse. After the. surgery, however, the mobility in his left shoulder decreased and the pain increased. There was testimony from other witnesses that appellant could not perform certain activities with his left arm after the surgery which he had been able to perform earlier. This evidence was sufficient to withstand appellee's motion for directed verdict on the issue of informed consent. Appellant failed to establish through expert testimony, however, that the surgery was the cause of his aggravated disability. This lack of proof on the issue of causality was fatal to his medical malpractice claim.

*Affirmed.*

---

2. As Professor Prosser explains:

[T]he plaintiff ... must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant. Where the conclusion is not one within the common knowledge of laymen, expert testimony may provide a sufficient basis for it, but in the absence of such testimony it may not be drawn. But on medical matters on which laymen are competent to judge, no expert testimony is required to permit a conclusion as to causation.

W. Prosser, Handbook of the Law of Torts § 41, at 241–242 (4th ed. 1971) (footnotes omitted).