Doris Holland DORN, Plaintiff,

v.

John W. McTIGUE, Defendant.

Civil Action No. 98–2149(RMU).

United States District Court,
District of Columbia.

July 23, 2001.

Peter Allman Greenburg, Greenburg, Spence & Green, LLC, Rockville, MD, for Plaintiff.

Joseph Montedonico, Montedonico, Hamilton & Altman, P.C., Chevy Chase, MD, for Defendant.

*MEMORANDUM OPINION*

URBINA, District Judge.

GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This doctor-patient dispute revolves around an unsuccessful cataract surgery. Doris Holland Dorn ("the plaintiff" or "Mrs. Dorn") filed a three-count complaint against her physician, John W. McTigue, M.D. ("the defendant" or "Dr. McTigue"), asserting claims for medical malpractice ("Count I"), lack of informed consent ("Count II"), and violation of the District

of Columbia Consumer Procedures and Protection Act ("CPPA") ("Count III"). The case comes to federal court based on diversity jurisdiction pursuant to 28 U.S.C. § 1332. Dr. McTigue now moves for summary judgment on all three counts. He argues that Mrs. Dorn has failed to make out prima-facie cases of medical malpractice and lack of informed consent. In addition, he contends that the CPPA does not apply to this case.

The court holds that the plaintiff has provided sufficient evidence on her claims of medical malpractice and lack of informed consent to preclude summary judgment. Thus, the court will deny summary judgment on Counts I and II. As for the CPPA claim, the court holds that the plaintiff has not provided sufficient evidence to preclude summary judgment. Accordingly, the court will grant summary judgment to the defendant on Count III.

## II. BACKGROUND

A cataract is a condition of the eye lens that produces a painless and gradual loss of vision. *See* American Law of Medical Malpractice 2d § 20:11 (1994). Most cataracts are not visible until they are sufficiently dense to cause blindness. *See id.* Although the cause of many cataracts is unknown, some cataracts are caused by trauma, radiation, or metabolic disorders associated with the eye lens. *See id.* Cataracts have also been linked to diabetes. *See id.* Regardless of the cause, cataracts are treated by surgical removal. *See id.* Potential complications associated with cataract surgery include infection and retinal detachment. *See id.*

Cataract surgery may involve other procedures, such as removal of the jelly-like substance in the eye called "vitreous." *See*

Mot. for Summ. J. at 9. If the vitreous is removed from the front of the eye, the procedure is known as an anterior vitrectomy. *See id.* Conversely, a posterior vitrectomy is the procedure for removing vitreous from the back of the eye. *See id.*

Cataract surgery and other related procedures can cause a macular hole in the eye. *See* Pl.'s Opp'n to Mot. for Summ. J. ("Pl.'s Opp'n") at 2. The macula is the part of the retina responsible for nearly 90 percent of all vision. *See id.* at 3. A macular hole is the separation of the portion of the retina constituting the macula. *See id.* An impending macular hole is a condition in which stress on the macula is likely to lead to separation. *See id.* With this background, the court turns to the case at bar.

In October 1995, Mrs. Dorn, then 65 years old, went to Dr. McTigue's office for her annual eye examination.[1] *See* First Am. Compl. ("Compl.") at 3. During this visit, Mrs. Dorn complained of decreased vision. *See id.* Dr. McTigue diagnosed Mrs. Dorn with an operable cataract in her left eye. *See* McTigue Dep. at 49. Sometime during this visit, according to Mrs. Dorn, Dr. McTigue told her "[w]hat you have I can fix, you have a cataract." Compl. at 7. Dr. McTigue also described some of the risks and benefits of cataract surgery, *see* McTigue Dep. at 36–37, and Mrs. Dorn was given an informed-consent form. *See* Mot. for Summ. J. at 2.

On November 16, 1995, Dr. McTigue performed cataract surgery on Mrs. Dorn's left eye. *See id.* During the surgery, a portion of Mrs. Dorn's lens fell into the posterior portion of her eye. *See id.* After Dr. McTigue failed to remove the lens, he sent Mrs. Dorn to the Washington

---

1. Although the court usually refers to parties using the titles Mr. and Ms., this plaintiff consistently refers to herself as "Mrs. Dorn." Thus, the court will adopt that style in this case.

Hospital Center for further surgery. *See id.* at 4.

During either the cataract surgery or the corrective surgery at Washington Hospital, the vitreous content of Mrs. Dorn's eye was removed, causing a macular hole. *See id.* As a result, Mrs. Dorn's retina was damaged, resulting in total loss of sight in her left eye. *See id.*

On September 8, 1998, Mrs. Dorn filed a complaint against Dr. McTigue.[2] In Count I, Mrs. Dorn alleges that Dr. McTigue committed medical malpractice by failing to use the proper standard of care in diagnosing the cause of her decreased vision. *See* First Am. Compl. ("Compl.") at 4. According to Mrs. Dorn, Dr. McTigue should have used additional diagnostic techniques to eliminate other potential causes of vision loss, such as macular edema, a pathologic disease of the macula, before performing cataract surgery. *See id.* at 3. Mrs. Dorn also claims that cataract surgery was unnecessary, and that Dr. McTigue subsequently attempted to perform a posterior vitrectomy, causing a macular hole in her left eye. *See id.*

In Count II, Mrs. Dorn alleges that Dr. McTigue did not properly inform her of certain risks and benefits of cataract surgery. *See* Compl. at 5–6. For example, Dr. McTigue did not inform Mrs. Dorn that he might have to retrieve lens material from her eye. *See* Notaroberto Decl. at 4. She also claims that Dr. McTigue did not tell her that she faced substantially increased risks of complications from the cataract surgery because she was diabetic. *See id.* As a result, she decided to proceed with the surgery, which ended up causing the vision loss in the left eye. *See id.* at 6.

Finally, in Count III, Mrs. Dorn asserts that Dr. McTigue violated the CPPA, D.C.Code §§ 28–3901 through 28–3909.

*See id.* at 7. She bases this claim on Dr. McTigue's alleged misrepresentation about the quality and standard of his services. Specifically, this charge focuses on Dr. McTigue's statement: "[w]hat you have I can fix, you have a cataract." *See id.*

In this case's first Memorandum Opinion dated July 26, 1999, the court held that the CPPA covers medical practitioners if the plaintiff's claim relates to the entrepreneurial aspects of the physician's practice. *See* Mem. Op. dated July 26, 1999 ("Mem. Op.") at 5 (denying Dr. McTigue's motion to dismiss the CPPA claim). The court adopted the clear-and-convincing burden of proof standard for intentional-misrepresentation claims under the CPPA. *See id.* In a second Memorandum Opinion dated September 28, 2000, the court held that an unintentional-misrepresentation claim would fall outside the CPPA's scope, as the statute applies to the practice of medicine. *See Dorn v. McTigue,* 121 F.Supp.2d 17 (D.D.C.2000). That ruling did not preclude the plaintiff's intentional-misrepresentation claim under the CPPA. *See id.* at 20.

Dr. McTigue now moves for summary judgment on all three counts. On Count I, Dr. McTigue argues that Mrs. Dorn failed to make out a prima-facie case of medical malpractice. *See* Mot. for Summ. J. at 1. With regard to Count II, he claims that Mrs. Dorn's injury was not caused by his failure to inform her of the alleged risk. *See id.* at 15–17. Finally, Dr. McTigue moves for summary judgment on Count III on the ground that Mrs. Dorn has failed to demonstrate that the CPPA applies to this case. *See id.* at 17–29.

## III. ANALYSIS

### A. Legal Standard

Summary judgment is appropriate when the pleadings and evidence demonstrate

---

**2.** On October 16, 1998, Mrs. Dorn filed an amended complaint.

that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine what facts are "material," a court must look to the substantive law on which each claim rests. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. All evidence and the inferences drawn therefrom must be considered in the light most favorable to the nonmoving party. However, a nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. *See id.* at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the ultimate burden of proof at trial." *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *See id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton,* 164 F.3d 671, 674 (D.C.Cir.1999). Rather, the nonmoving party "must come forward with specific facts" that would enable a reasonable jury to find in its favor. *See id.* If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Celotex,* 477 U.S. at 249–250, 106 S.Ct. 2505 (internal citations omitted).

**B. Count I (Medical Malpractice)**

■ The plaintiff's first cause of action involves two claims of medical malpractice. *See* Compl. at 2. First, the plaintiff alleges that the defendant performed an unnecessary surgery. *See id.* Second, the plaintiff claims that the defendant failed to perform the surgery properly. *See id.* To succeed on a medical malpractice claim, the plaintiff must establish the applicable national standard of care, a deviation from that standard, and a causal relationship between the deviation and the injury. *See Travers v. District of Columbia,* 672 A.2d 566, 568 (D.C.1996). The national standard of care must be established through expert testimony. *See id.*

The defendant argues that the court should grant summary judgment dismissing Court I for three reasons: (1) the factual basis for the plaintiff's expert's opinions are speculative; (2) the plaintiff fails to establish the national standard of care; and (3) the plaintiff fails to establish proximate cause. The court addresses each argument in turn.

*1. Plaintiff's Expert's Opinions*

■ The defendant argues that the plaintiff's expert, Dr. Notaroberto, failed to establish that the defendant misdiagnosed Mrs. Dorn. *See* Mot. for Summ. J. at 9. Specifically, the defendant submits that the misdiagnosis claim must fail because Dr. Notaroberto was "unable to unequivocally state that Mrs. Dorn's vision difficulty…was due to anything other than a cataract." *Id.* at 9. The defendant argues

that as a result, Dr. Notaroberto's opinions are speculative. *See id.* at 8.

In his deposition, when asked what evidence he had that Mrs. Dorn's vision problems were caused by something other than a cataract, Dr. Notaroberto answered that he did not have any "direct evidence." *See id.* (quoting Notaroberto Dep. at 81). The plaintiff argues that Dr. Notaroberto's use of the term "direct evidence" is limited to its legal definition. *See* Pl.'s Opp'n at 7. In other words, Dr. Notaroberto replied that he had no "direct evidence" because he was relying on other physicians' charts and records. *See id.* at 7–8. This evidence, the plaintiff argues, is not "direct," but circumstantial because Dr. Notaroberto could not testify directly about other physicians' charts and records. *See id.* The court agrees with the plaintiff.

In light of the entire record, Dr. Notaroberto's isolated statement is not sufficient for the court to hold that his opinions are speculative. On a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. In this case, the court concludes that the inference that the plaintiff's expert witness was distinguishing direct evidence from circumstantial evidence is justified.

### 2. *National Standard of Care*

The defendant next argues that the plaintiff has failed to establish a national standard of care because Dr. Notaroberto did not provide a specific and articulated basis for his opinion. *See* Mot. for Summ. J. at 10–14.

■ When establishing the national standard of care, the expert needs to "articulate and reference a standard of care by which the defendant's actions can be measured." *Messina v. District of Columbia,* 663 A.2d 535, 538 (D.C.1995). The

expert's opinion as to what he would do under similar circumstances, by itself, is not sufficient. *See id.*

■ The plaintiff alleges medical malpractice under two theories. First, the defendant performed an unnecessary surgery, and second, he failed to perform the surgery properly. *See* Compl. at 2. With respect to the first theory, Dr. Notaroberto states that the defendant failed to meet the national standard of care because he did not examine the plaintiff thoroughly enough. *See* Notaroberto Decl. at 2. That is, the national standard of care required the defendant to utilize a "slit lamp biomicroscopy technique in conjunction with 90D or similar lens or a contact lens" and a potential acuity meter ("PAM"), which is used to examine the retina closely and helps identify stages of macular holes. *See id.*

The preceding statements by Dr. Notaroberto establish a standard by which the wisdom of the defendant's actions can be assessed. *See Messina,* 663 A.2d at 538. For example, if Dr. Notaroberto's statement of the national standard of care were correct, then the defendant's failure to utilize the PAM when examining Mrs. Dorn would be a breach of the national standard. Moreover, the national standard does not merely reflect what Dr. Notaroberto would do under similar circumstances. Rather, relying on a study in the March 1989 *Journal of Cataract and Refractive Surgery,* Dr. Notaroberto stated that the PAM is "considered a standard of care by many." *See* Notaroberto Dep. at 74.

The plaintiff's second medical malpractice theory is that the defendant performed the plaintiff's cataract surgery improperly. *See* Compl. at 2. Dr. Notaroberto contends that the defendant should not have performed a posterior vitrectomy. *See* Notaroberto Dep. at 115–116. Because of complications, namely,

the plaintiff's lens falling into the posterior portion of her eye, Dr. Notaroberto stated that the defendant—a surgeon used to operating on the anterior portion of his patients' eyes—should not have proceeded with the plaintiff's surgery. *See* Notaroberto Dep. at 115–116.

■ The defendant counters with three arguments. First, he says he did not perform a posterior vitrectomy. *See* Mot. for Summ. J. at 14. But whether the defendant performed surgery on the posterior portion of Mrs. Dorn's eye is a genuine issue of material fact. *Cf.* Pl.'s Opp'n at 2 (the defendant attempted "to remove the lens fragments which fell to the back of the eye") *with* Mot. for Summ. J. at 3 (the defendant performed an anterior vitrectomy). Therefore, summary judgment is inappropriate. *See generally Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

■ Second, the defendant insists that Dr. Notaroberto "admitted that some anterior surgeons are not incompetent in performing [a posterior vitrectomy]." *See* Mot. for Summ. J. at 14. But the defendant selectively quotes from Dr. Notaroberto's deposition. In acknowledging that some anterior surgeons are competent to perform a posterior vitrectomy, Dr. Notaroberto said that the qualified surgeons "are the ones who have had [to handle] complications [during surgery] before." *See* Notaroberto Dep. at 116. The defendant, however, has never had to handle similar complications. *See* McTigue Dep. at 66–67. According to Dr. Notaroberto, then, Dr. McTigue was not competent to perform a posterior vitrectomy. *See* Notaroberto Decl. at 116 (an anterior surgeon who is qualified to perform a posterior vitrectomy is "more the exception than the rule").

■ Thirdly, and least convincingly, the defendant argues that Dr. Notaroberto

does not "provide a specific and articulated basis" for his assessment of what constitutes the national standard of care. *See* Mot. for Summ. J. at 11 (relying on *Phillips v. District of Columbia,* 714 A.2d 768 (D.C.1998) and *Clark v. District of Columbia,* 700 A.2d 235 (D.C.1997)). Relying on these cases, he contends that the plaintiff's expert failed to cite recognized medical treatises, articles, or studies, to support his belief as to what constitutes the national standard of care in cases involving cataract surgeries. In short, the defendant maintains that the plaintiff has failed to make the requisite showing regarding what, if any, national standard of care applies.

But the defendant misinterprets case law. Both cases cited by the defendant went to trial. *See Clark,* 700 A.2d at 235 (two-week jury trial); *Phillips,* 714 A.2d at 770 (two-day jury trial). In this case, however, the court is ruling on a summary-judgment motion. Unlike at trial, the plaintiff opposing a summary-judgment motion does not have the burden of providing persuasive evidence on every element of her case. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Thus, the plaintiff has not yet had a full opportunity to prove what the national standard of care is in this case. Accordingly, the court holds that Dr. Notaroberto has provided enough of a specific and articulated basis for his expert opinion to survive summary judgment. *See, e.g.,* Notaroberto Dep. at 74 (relying on a study in the March 1989 *Journal of Cataract and Refractive Surgery* ). Just as the *Clark* and *Phillips* defendants did, however, the defendant preserves his right to visit this issue again at trial after the plaintiff has presented her case.

3. *Proximate Cause*

The defendant also argues that the plaintiff has failed to provide sufficient evidence of proximate causation. *See* Mot.

for Summ. J. at 14. Mrs. Dorn's vision loss was caused by a macular hole in her left eye. *See* Phillips Dep. at 45. Dr. McTigue argues that he could not have caused the macular hole because he did not perform a posterior vitrectomy. *See* Mot. for Summ. J. at 15.

The plaintiff articulates two reasons why there is sufficient evidence of proximate causation in this case. *See* Pl.'s Opp'n at 2. First, the plaintiff argues that Dr. McTigue's failed efforts to remove the lens fragments from the posterior portion of Mrs. Dorn's eye caused the macular hole. *See id.* at 2–3. The plaintiff further argues, in the alternative, that Dr. McTigue's failure to identify an impending macular hole in Mrs. Dorn's left eye may have caused her vision loss. *See id.* at 2.

■ To establish proximate cause, the plaintiff's expert must state an opinion "based on a reasonable degree of medical certainty, that the [defendant] more likely than anything else [was] the cause (or a cause) of the plaintiff's injuries." *Travers,* 672 A.2d at 570. The first argument that could establish proximate cause is that Dr. McTigue caused trauma to Mrs. Dorn's macula when he performed a posterior vitrectomy—resulting in a macular hole. *See* Pl.'s Opp'n at 2–3. The defendant maintains that he did not perform a posterior vitrectomy. *See* Mot. for Summ. J. at 14–15. Whether Dr. McTigue performed a posterior vitrectomy is a genuine issue of material fact because its resolution could establish causation as to this medical-malpractice claim. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Therefore, summary judgment is inappropriate under this argument. *See id.*

■ The plaintiff's second argument that could establish proximate cause is that Dr. McTigue failed to identify an impending macular hole in Mrs. Dorn's left eye. *See* Pl.'s Opp'n at 2. The defendant

responds that the plaintiff's "impending macular hole" argument is a new theory of medical malpractice and should be disregarded by the court. *See* Reply at 1. The court disagrees with the defendant because his characterization of the plaintiff's "theory" is too narrow. Dr. Notaroberto repeatedly stated that there may have been a macular hole in Mrs. Dorn's eye before the cataract surgery. *See* Notaroberto Dep. at 119–122. Dr. Notaroberto, however, did not exclude an impending macular hole as one of the causes leading to Mrs. Dorn's vision loss. Therefore, the plaintiff's "impending macular hole" theory is not a "new theory."

Thus, there is a genuine issue of material fact as to whether the defendant performed a posterior vitrectomy and whether he failed to identify the plaintiff's impending macular hole. Accordingly, the court will deny the defendant's motion for summary judgment on Count I.

### C. Count II (Lack of Informed Consent)

■ The plaintiff's second claim is lack of informed consent based on the defendant's alleged failure to inform her of a "known significant possibility of . . . complications [from cataract] surgery." *See* Compl. at 5–6. As a general rule, doctors are required to disclose all material risks related to surgeries to their patients. *See, e.g., Crain v. Allison,* 443 A.2d 558, 562 (D.C.1982). To prevail on an informed-consent theory, the plaintiff must establish that if she had been alerted to the material risk, she would not have consented to the surgery, and that the surgery caused her injury. *See Kelton v. District of Columbia,* 413 A.2d 919, 922 (D.C.1980).

The defendant argues that the court should grant summary judgment on this count because the plaintiff's injury was not caused by the alleged risk that Dr. McTi-

gue failed to inform her about.[3] *See* Mot. for Summ. J. at 15–17. The court disagrees.

### 1. *Causation Requirement*

■ The defendant argues that the plaintiff has not provided sufficient proof that his failure to inform her of certain risks led her to have the surgery and that the undisclosed risks materialized and caused her vision loss. *See* Mot. for Summ. J. at 15 (citing *Gordon v. Neviaser*, 478 A.2d 292, 296 (D.C.1984)).

In his declaration, Dr. Notaroberto stated that "there are *only two probable causes* of the macular hole in Mrs. Dorn's left eye." Notaroberto Decl. at 3–4 (emphasis added). The first possible cause is an impending macular hole that was separated during surgery. *See id.* Because Mrs. Dorn is diabetic, she faced increased risk of adverse results, including the possibility of an impending macular hole being separated during surgery. *See id.* As to this possible cause, Mrs. Dorn has presented sufficient evidence to allow a jury to determine whether Dr. McTigue's conduct brought about the injury.

The second probable cause is the surgery itself or subsequent repair procedures. *See id.* If the macular hole was caused during surgery, it was a result of excessive trauma to Mrs. Dorn's retina. *See id.* This trauma was a known risk of potentially having to retrieve lens material from Mrs. Dorn's eye. *See id.* According to Dr. Notaroberto, the defendant should have informed the plaintiff of these risks. *See* Notaroberto Decl. at 4. Therefore, as to the second possible cause, the plaintiff has also presented sufficient evidence to allow a reasonable jury to determine that

the defendant's failure to inform the plaintiff about these risks led her to have the surgery, and that during the surgery, the risks materialized, leading the plaintiff to lose sight in her left eye.

Because the plaintiff's evidence could reasonably allow a jury to determine that Dr. McTigue's conduct brought about her injury, the court denies the defendant's motion for summary judgment on Count II.

### D. Count III (Violation of the CPPA)

■ The plaintiff's third cause of action is the defendant's alleged violation of the CPPA. *See* Compl. at 7. In the July 1999 Memorandum Opinion, the court held that the CPPA applies to the medical profession under certain circumstances. *See* Mem. Op. at 5. First, the plaintiff must satisfy the "threshold requirements set forth in D.C.Code §§ 28–3901–3904". *See id.* Second, the plaintiff must demonstrate a nexus between the claim at issue and the "entrepreneurial aspect of the medical practice." *See id.* Finally, the plaintiff must meet the "clear and convincing" burden of proof standard. *See id.*

In this case, the plaintiff complains of the defendant's alleged statement during a pre-surgery meeting, "[w]hat you have I can fix, you have a cataract." *See* Compl. at 7. This statement misled the plaintiff into believing that there wasn't any "significant risk of complication or adverse result" related to the surgery. *See id.* at 8.

The defendant argues that the court should grant summary judgment on Count III for three reasons: (1) the CPPA does not apply to medical-malpractice claims;

---

**3.** The defendant also argues that the plaintiff failed to articulate a "specific material risk" that he should have informed her about. *See* Reply at 7–9. Because this argument was not a part of the Motion for Summary Judgment and was raised for the first time in the Reply, the court will not address it. *See Herbert v. Nat'l. Acad. of Sciences*, 974 F.2d 192 (D.C.Cir.1992).

(2) the alleged claim is not "entrepreneurial," as required under the CPPA; and (3) the defendant's alleged statement is not false or an intentional misrepresentation. *See* Mot. for Summ. J. at 17–29. The court addresses each argument in turn.

### 1. *The CPPA's Applicability*

According to the defendant, the CPPA does not apply to this case for two reasons. *See id.* at 17–18. First, the defendant argues that this court does not have jurisdiction because the plaintiff's CPPA claim properly lies "in tort for personal injury." *See id.* at 18. Second, the defendant asserts that Dr. McTigue is not a "merchant," and the plaintiff is not a "consumer," as required by the CPPA. *See id.* at 18–19.

■ The defendant bases its jurisdictional argument on the notion that the plaintiff's CPPA claim lies in a tort for personal injury. The defendant asserts that this court's jurisdiction and available remedies are limited to the jurisdiction of the Department of Consumer and Regulatory Affairs ("Department"). *See id.* at 18 (citing D.C.Code § 28–3905(k)(1)). The defendant argues that because the CPPA both restricts the Department from ordering "damages for personal injury of a tortious nature," *see* D.C.Code § 28–3903(c)(1), and forbids the Department from providing the requested remedy of monetary damages, this court does not have jurisdiction over the plaintiff's CPPA claim. *See* Mot. for Summ. J. at 17–18.

The court disagrees with the defendant's characterization of the plaintiff's CPPA claim. Even though the plaintiff has alleged two tortious causes of action (medical malpractice and lack of informed consent), the plaintiff's CPPA claim does not "lie in tort for personal injury," as argued by the defendant. *See id.* at 18. In denying the defendant's motion to dismiss the plaintiff's CPPA claim, the court held that

the CPPA applies to physicians, if, among other things, the plaintiff "demonstrate[s] a nexus between the [CPPA claim] and the entrepreneurial aspect of the medical practice." *See* Mem. Op. at 5. The court concluded that it had jurisdiction over the plaintiff's CPPA claim "under the particular facts of this case" because of its entrepreneurial aspect. *See* Mem. Op. at 1 n. 1. If the plaintiff's CPPA claim challenged Dr. McTigue's actual medical competence, the court may not have jurisdiction under the CPPA. *See Nelson v. Ho*, 222 Mich. App. 74, 564 N.W.2d 482, 486 (1997). But in this case, the plaintiff alleges that Dr. McTigue misrepresented material facts about the cataract surgery, constituting an unlawful trade practice under the CPPA. *See* Compl. at 7–8. Therefore, the court has jurisdiction to determine if the plaintiff has satisfied the requirements for the CPPA claim in this case.

■ The defendant also argues that the CPPA does not apply because the plaintiff has not met the threshold requirements set forth in the CPPA. *See* Mot. for Summ. J. at 18–19. Specifically, Dr. McTigue asserts that he is not a "merchant," as required by D.C.Code § 28–3901(a)(3), and that Mrs. Dorn is not a "consumer," as required by D.C.Code § 28–3901(a)(2). *See id.*

The CPPA defines a "merchant," in pertinent part, as a person who supplies services that are the "subject matter of a trade practice." *See* D.C.Code § 28–3901(a)(3). "Trade practice" is defined, in pertinent part, as any act that makes available, provides information about, solicits, or offers a sale of consumer services. *See* D.C.Code § 28–3901(a)(6). Professional services, such as legal services, have been deemed a "trade practice" under the CPPA. *See Banks v. District of Columbia*

*Dep't of Consumer & Regulatory Affairs,* 634 A.2d 433, 437 (D.C.1993).

The defendant provided medical services, analogous to the legal services in *Banks*. Therefore, this court holds that the defendant is a "merchant," as required under the CPPA, because he supplied services that are the "subject matter of a trade practice," namely, services that are the subject of medical practice. *See* D.C.Code § 28–3901(a)(3).

■ The defendant also argues that the plaintiff is not a "consumer," as required by the CPPA. *See* Mot. for Summ. J. at 18–19. The CPPA defines "consumer," in pertinent part, as a person who provides "the economic demand for a trade practice." *See* D .C.Code § 28–3901(a)(2). Having established that the defendant supplies services that are part of a trade practice, it then follows that the defendant's customers, such as the plaintiff, provide "the economic demand for a trade practice," i.e., the demand for the defendant's medical practice. *See id.*

In sum, the court has jurisdiction over the plaintiff's CPPA claim and the CPPA does apply to this case.

### 2. *The "Entrepreneurial Nexus" Requirement*

■ The next inquiry is whether the plaintiff has demonstrated a nexus between the defendant's alleged violation of the CPPA and the entrepreneurial aspect of his medical practice. *See* Mem. Op. at 5. To separate CPPA claims from standard malpractice claims, this court distinguished "conduct within the entrepreneurial, commercial, or business aspect of a physician's practice" from the "actual practice of medicine." *Id.* (quoting *Nelson,* 564 N.W.2d at 485–86). For a CPPA violation based on intentional misrepresentation, the plaintiff must demonstrate the required nexus by satisfying the "common-law standard of

'clear and convincing evidence.'" *Id.* (quoting *Osbourne v. Capital City Mortg. Corp.,* 727 A.2d 322, 325 (D.C.1999)).

■ The defendant argues that his alleged statement "[w]hat you have, I can fix..." does not meet the nexus requirement. *See* Mot. for Summ. J. at 21–27. Specifically, the defendant asserts that the alleged statement is conduct within the "actual practice of medicine," as opposed to the entrepreneurial aspect of the medical practice. *See id.* at 27. Conversely, the plaintiff argues that Dr. McTigue's statement, along with other facts in the record, is "sufficient to go to the jury as clear and convincing evidence of an intentional deceptive trade practice." Pl.'s Opp'n at 11–12. In this instance, the defendant has the stronger argument.

According to the plaintiff, "a jury may well conclude that" it was Dr. McTigue's customary practice to withhold information about risks associated with cataract surgery. *See* Pl.'s Opp'n at 10. The plaintiff also asserts that "*[i]f* Dr. McTigue's promising results and failing to disclose risks" induced patients to consent to cataract surgery, *then* Dr. McTigue's conduct was a "marketing device" related to the business aspect of his medial practice. *See id.* at 10–11 (emphasis added).

The plaintiff's argument, however, cannot withstand a motion for summary judgment. In denying the defendant's motion to dismiss, this court pointed out that "there [was] no specific showing [by the plaintiff] that the defendant was motivated by entrepreneurial motives...." Mem. Op. at 6. The legal standard applied to a motion to dismiss differs from the one applied to a motion for summary judgment. Simply put, the bar is now higher. On a motion to dismiss, the moving party must show that the nonmoving party failed to *plead* a necessary element. *See* Mem. Op. at 7 ("Evidence may be adduced during

the discovery phase that may [establish] the applicability of the CPPA under the particular facts of this case..."). By contrast, on a motion for summary judgment, the moving party must show that the non-moving party "fail[ed] to *make a showing* sufficient to establish the existence of an element essential to that party's case...." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548 (emphasis added).

In this case, the plaintiff has failed to make a showing sufficient to establish that the defendant's alleged statement was motivated by entrepreneurial motives. Nothing in the record establishes that the entrepreneurial aspect of his business motivated the defendant. Instead, the expert testimony that the plaintiff relies on refers to the appropriateness of the defendant's statement to the plaintiff and the weight of verbal statements versus written forms. *See* Pl.'s Opp'n at 10; Notaroberto Dep. at 138–139.

Without more evidence than the one statement at issue, the plaintiff's claim of intentional misrepresentation falls well short of what is needed to allow a jury to infer intentional misrepresentation by clear and convincing evidence.

In light of the applicable "clear and convincing evidence" burden of proof for intentional misrepresentations under the CPPA, this court holds that as a matter of law, a reasonable jury could not conclude that the alleged statement by Dr. McTigue was motivated by entrepreneurial motives. Because this court finds that the plaintiff has failed to meet the entrepreneurial-nexus requirement, it need not address the defendant's third argument (whether the defendant's alleged statement is false or a misrepresentation). Accordingly, the court grants the defendant's motion for summary judgment on Count III.

## IV. CONCLUSION

For all these reasons, the court grants in part and denies in part the defendant's motion for summary judgment. Specifically, the court denies the defendant's motion for summary judgment on Counts I and II, and grants the defendant's motion on Count III. An order directing the parties consistent with this Memorandum Opinion is separately and contemporaneously issued this 23rd day of July, 2001.

## *ORDER*

### GRANTING IN PART AND DENYING IN PART THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated in this court's Memorandum Opinion separately and contemporaneously executed and issued this 23rd day of July, 2001, it is hereby

**ORDERED** that the defendant's motion for summary judgment [document # 43] is **GRANTED** in part and **DENIED** in part; and it is

**FURTHER ORDERED** that the court **DENIES** the defendant's motion for summary judgment on Counts I and II, and **GRANTS** the defendant's motion for summary judgment on Count III.

Because the court grants summary judgment on the CPPA claim, the court **DENIES** the plaintiff's motion to compel answers to interrogatories [document # 53].

**SO ORDERED.**